Judge Robertson
delivered the opinion of the court.
This case was once before in this court, and is reported in I. Monroe, 171.
At the June term, 1825, of the circuit court, whose decision had been reversed by this court, a document, purporting to be the opinion and mandate of the court of appeals, as reported in I. Monroe, certified by F. P, Blair as clerk of that court, was produced and entered on the record; and thereupon, the case, by order of the court, was re-decketted and continued. To all this no objection seems to have been made. At the subsequent September term of the court, the defendants appeared, and, by consent, the cause was continued at their cost.
At the next term, the defendants moved for a continuance, which being denied, they excepted, and seemed to rely on the ground that they could not be *565 torced into a trial until the opinion of this court should be certified by its constitutional clerk. .
They also, at the same term, moved the court rescind the order admitting the copy of the opinion, and reinstating the cause on the docket. This motion was also overruled, and the defendants excepted.
A verdict being rendered for the plaintiffs, the court set it aside, and awarded a new trial, the verdict being for a less sum than the court considered the plaintiffs entitled to recover, by the proof.
At a subsequent term, the defendant, Taylor, (all the other defendants having died,) filed a plea, averring that the defalcations of the cashier, Pendleton, were “known to” and “connived at as they occurred,” by the president and directors of the branch bank at Bardstown. On the filing of this plea, the court continued the cause at the defendant’s cost. To this ho excepted.
At the next term a demurrer to this plea, was sustained by the court; and the case was .tried on the issues which had been made up before this court decided it. The court having refused to the defendant a new trial, he appealed to this court.
Various errors are assigned, the principal of which question the decision on the motion to rescind the order, or to continue the case; and that rendered on the demurrer to the plea: most of. the others are virtually disposed of by the former opinion of this court.
Before the first trial after the return of the cause to the circuit court, the defendants offered a plea, alleging performance of his covenant by Pendleton, and that, since the execution of the bond sued on, he had executed another bond with other, securities, which had been accepted by the bank. The filing of this plea being opposed, the court refused to permit it to be filed.
The latter branch of the plea was certainly insufficient. See the former opinion. The first part of the plea might, alone, have been good. But no reason *566 is shown for filing it so long after the issues had been made up, and the court, without some satisfactory reason, which does not appear, would have erred if it had suffered a simple plea of covenants performed^ to be filed at the time this plea was offered.
Oyer once, is all that party can require in same suit.
The defendants, at the same time, demanded oyer of the bond, which was refused, because oyer had' been given on the former trial. There was no error in this; oyer once, is all that can be required by a party, in the same suit. If oyer had been properly demanded on the former trial, either the original bond was on file, or a copy of it was in the record. If, on oyer, it had been read, oyer could not be demanded again.
The usual mode of authenticating the opinions and mandates of this court, is by the official certificate of its clerk., F. P, Blair was not its clerk. He obtained the possession of this and other documents and records of the court, and forcibly withheld them from Sneed, who was the clerk. Blair was recognized by a portion of the sovereign power, as the clerk. He claimed to be clerk, and had the semblance of authority. But his appointment was made without constitutional power to make it, and therefore, as has been declared by this court, was void, and conferred no right on him. No court or individual was bound to regard his acts or certificates as valid. But whether, if a court should choose to accredit his authentications, without opposition or objection, this court would be authorized to control its decisions, and-reverse, for that cause alone, is quite another and' very different question. Blair did not claim to be clerk of the constitutional court of appeals. He was-not recognized as its clerk. Bu t as he had the records, of the court, and no other could, without his leave, take copies from them, we could not say that a circuit court might not rightfully, give credence, “pro hac vice,” to his certified copies, if their genuineness were not questioned by either party.
But be this as it may, an official certificate being necessary, only as evidence to assure the court that the copy certified, is a true copy; if an opinion of this qourt be presented to the inferior court, without *567 any authentication, and no objection be made to its want of authentication, although it would be rash and irregular to receive and act upon it, as an authoritative mandate, yet if the court do so, its final judgment ought not to be reversed, for that cause alone, unless it should appear that this court rrendered no such opinion, or the copy had been objected to for want of authentication.
In this case, the defendants being parties in this court, knew whether an opinion had been given, and what that opinion was. When the paper, certified by Blair as the opinion, was exhibited, they knew whether it was genuine, or had been truly transcribed. No objection being made to it, is a tacit admission of its genuineness. If this court gave such an opinion, the circuit court, on ascertaining that fact, might proceed with the cause again. The mode of ascertaining the fact, is not so important as the fact itself. It is prudent, to observe the safe and usual mode. But it would not be denied that a circuit court might, very properly, receive and obey a sworn copy of a mandate of this court; that is, a transcript taken by a private individual, and verified by his oath. If, without any certificate from Blair, the defendants below had admitted that the copy offered and received, in this case, was a true copy, there would have been no necessity for any further proof of it. We consider their conduct as a virtual admission in this case. They made no objection until at the second term after the opinion was entered and the cause reinstated; and even then, they did not intimate, that the opinion which had been received, was not precisely that which had been rendered by this court, or that there had been any other. They objected, only to the authentication. It was too late to object to the admissibility of the evidence, for certifying the opinion, after that evidence had been received, not only without their objection, but apparently, with their perfect acquiescence and concurrence.
If they had insisted and proposed to show that no such opinion had ever been given, it was not too late to do so. The court still had control over its preparatory and interlocutory orders, and this copy being *568 the only authority of the court, it had a right, at anytime before final1 judgment, to refuse to proceed, if it had any reason to doubt the authority. But they did not even intimate a doubt that the copy was perfectly correct. They were not strangers to it. Being parties, and therefore, knowing what the opinion was, when they did not deny that such an opinion was rendered, they admitted it. The court had a right* therefore, to proceed with the causes And this court will presume that its authority for doing so, was not spurious or illegal, until it be shown to be so. No such attempt has been made. The authority wag the mandate of this court, admitted by the acts of the appellant. It is not necessary to decide whethéi1, the opinion being on file in the office of this court, and reported in I. Monroe, we should take judicial notice of it.
If bond, on its face, shew party to be security, he may plead, at law, any matter which will be a legal discharge t>f himself; but if bond do hot shew party to be security, chancellor alone, can give relief.
If the plea be good* it must be so on one of two grounds: 1st. Because it avers a fraud by the bank* on the sureties. 2d. Because an unreasonable and unjust indulgence was extended by it to Pendleton, to the injury of his sureties.
We cannot admit that it charges a-fraud, or such an one as should exempt the sureties. The cashier’ was responsible to the managers of the mother bank. He held his trust at their will. They could remove him at any timew If the law had made it their duty to remove him for any ascertained delinquency, and they knew of any such cause for removal, and not only retained him in service, but winked at his improper conduct, the sureties would not be liable in either a court of equity or of law, for any breach of his bond, which might afterwards occur. The reason why matter which would release a surety, the principal being still liable, cannot be made available, generally, at law, is, that all the obligors are usually bound, jointly and severally, as principals. In such cases, the chancellor alone can give relief. But when the bond shows on its face, as in this case, that one obligor is the principal and another his surety, it has been decided by the supreme court of New-York, that anj' matter which would relieve the surety, may be pleaded, as well at law as in equity. If it be a legal ex-tinguishment, it may be relied on in a suit in a com *569 mon law court, whenever the bond shows that the party urging it is only a surety. If the bond do not show this fact, it would be a violation of a fixed principle of the common law* to permit a plea to be filed, which would contradict the legal import or deny the legal effect of the written evidence of the contract. And hence, for this reason alone, in such cases, the appeal can be made to the chancellor only. The People vs. Jansen, VII. Johnson’s Reports, 332.
Plea to action, which only answers part, is bad on deraurreri
What effect the Kentucky statute, authorizing the impeachment of written contracts by plea, might have on this question, it is not necessary now to determine. For as the bond in this Case, shows that Taylor, who filed the plea, was only Pendleton’s surety, the plea,if otherwise good, was admissible on common law principles.
This brings us to inquire into the sufficiency of the allegations of the plea. We consider the plea insufficient for the following reasons:
1st. If its averments be good, as far as they may operate, the plea is bad, because it is an attempt to bar the whole action, when, if it be true, and its allegations show an available defence, the bank would, nevertheless have a right to recover for the first defalcation or breach of good conduct by- Pendleton. For it is not pretended that the bank was notified of that, before it occurred. The plea then being filed in bar of the entire action, and showing as it does, that the matter on which it relies, would not extin■guish the whole cause of action, was evidently insufficient.
2d. It does not directly charge fraud by the appel-lees; and such a charge is not necessarily imported by its phraseology. It imputes to the directory of the branch bank only, a knowledge of the delinquencies of the cashier, and a connivance at them. It was their duty, if they had any such knowledge, to communicate it to the mother bank. And if they failed to do it, there would be more reason for charging them with fraud on the mother bank, than for imputing it to any fraud on the sureties of the cashier. It is not the presumption of either law or fact, that every thing known to the branches is communicated to the *570 principal bank. The cashier of a branch is an agen»; of the mother bank; the directors of the same branch other agents of the same parent institution. •Suppose these several agents combine to defraud their principal, is the one excused by the fact that the other is parliceps? Is the surety of one exonerated, because.the'other has co-operated in the malfeasance? -Or suppose one connive at the fraud or improper conduct of the other, is the employer responsible, because one of its agents knew of the delinquency and might have prevented its recurrence? The legal maxim, ilQuz fácil per alium fácil per sef does not apply to such a case. The connivance of the branch is not that of the mother bank. The fraud of the branch is not the fraud of the mother institution, because, if the plea be true, there was a tacit combination of the agents to injure the principal. If A, employ an agent to transact particular business, and exact from him security for his fidelity, and constitute another agent, to perform other associate and supervisory functions, surely, if they both conspire to defraud their constituent, the security shall not be permitted to say that the act of the agent is that of the principal.
3d. But if the directory at Frankfort had known that Pendleton was a defaulter, it would not follow that it was their duty to dismiss him. It might have been prudent to do so. But whether it would have been even proper to do so, would have depended on the nature of the default. The law did not enjoin on the directory, the duty of removing for any specific cause. They, did not undertake, expressly or by implication, to notify the sureties of every omission of duty which they might detect in the cashier, or to remove him for every such omission.
If the law had made it the duty of the directory at Frankfort, to examine the conduct of the cashiers of the branch banks periodically, and to remove them for any of the acts imputed to Pendleton in this case, then a plea by his sureties would be good, so far as it would charge a failure to remove, after a knowledge that cause for removal existed. Because the sureties, in such a case, might reasonably be supposed to have *571 consented to be responsible for the fidelity of the cashier, from their confidence that this check would be a security to them, and that the directory would do their duty. This, indeed, would be considered a part of the contract. Such was the case of the People vs, Jansen, supra. And in that case the sureties were relieved at law, from liability for breaches committed by their principal, after it became the duty, by law, of certain agents of government to remove him; and they were relieved from responsibility for the first breach, by an unjust indulgence extended to their principal, until he became insolvent.
But the reasoning in that case, shows that an omission to remove an agent, will not release his sureties, unless the removal be a duty enjoined and prescribed by law. And some of the authorities quoted in the opinion of the court, establish the doctrine, that in cases like this, a failure to dismiss the principal, does not, “per se,” exonerate the surety.
4th. If the court be mistaken in the force of the foregoing objections to the plea, there is yet another which would be fatal; if otherwise, the plea were good. It does not show that the sureties were prejudiced by any forbearance by the bank to the cashier. It does not aver that he had become insolvent, and some injury of this kind, resulting to the sureties, from the negligence or connivance of the bank, would be indispensable to their exoneration. See “The People vs. Berner, XIII. Johnson, 383. This case also supports the reasoning in the third objection to the plea; and shows, by analogy, that his sureties are responsible for all the breaches of Pendleton’s bond, how long soever the series may be. This is exactly what they became sureties for. The plea alleges nothing which could exonerate Pendleton. The sureties engaged to be responsible for his acts as cashier. Any breach of his bond, therefore, rendered them liable to the same extent as he was liable, unless the obligees had done, or omitjed to do some thing, which, by their contract, or by their charter, would resulHn the release of the,sureties. The plea does not pretend that there is any such cause for exoneration.
Haggin and Mills, for appellant5 Crittenden and Hardin, for appellees.
To this extent, we would concur with the court ol New-York, whether we would go farther, need not be now decided.
On the second point there can be no doubt. The plea does not show any thing which, on the ground of indulgence, would exonerate the sureties, even in equity. It does not intimate that the obligees indulged the cashier to the prejudice of his sureties, it does not charge that the obligees connived at, or countenanced the delinquencies of the cashier, or delayed bringing their suit, unreasonably, after they were notified of his defalcation, whereby the sureties were injured. And all this, if it had been averred, would have been no defence to this action.
A connivance by the mother bank would not be simply passive. It would imply that the delinquencies of the cashier had been winked at and encouraged. This would be a fraud oh his sureties. But if the plea had even averred such a fraud by the obli-gees, it would not bar this action, because it would admit a liability for the first defalcation. If the obli - gees were guilty of any such fraud, therefore, the remedy is in chancery.
Judgment affirmed.